**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, THOMAS W.** | : | |
| **CORBETT, JR., GOVERNOR** | : | |
| **Plaintiff** | : | **No. 1:13-cv-00006** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **NATIONAL COLLEGIATE** | : | |
| **ATHLETIC ASSOCIATION,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the Court is the motion of Defendant National Collegiate Athletic Association

(NCAA) to dismiss Plaintiff Commonwealth of Pennsylvania's complaint.  (Doc. No. 9.)  The

motion has been fully briefed and is now ripe for disposition.  The Court heard oral argument on

Defendant's motion on May 20, 2013.  For the reasons that follow, the Court will grant

Defendant's motion.

**I.      BACKGROUND**[1]

This case finds its origins in sanctions imposed against the football program at the

Pennsylvania State University (Penn State) by the governing body of college sports, the NCAA.

Penn State agreed to the sanctions at issue here and waived any legal challenge to the sanctions

or the manner in which they were adopted.  The Governor of the Commonwealth of Pennsylvania

brings this antitrust action on behalf of the natural citizens of Pennsylvania, challenging the

sanctions under Section 1 of the Sherman Act as an unlawful agreement to restrain trade and

seeks an order enjoining enforcement of the sanctions.  Penn State is not a party to this action and

---

[1] The following background is taken from the factual allegations of Plaintiff's complaint.

1

takes no position in this litigation.

A.    **Sandusky sexual abuse scandal**

The challenged sanctions were imposed following a widely publicized child sex abuse scandal that implicated Penn State officials.  On November 4, 2011, after an extensive grand jury investigation into horrific allegations that former Penn State assistant football coach Gerald A. Sandusky sexually abused children for over a decade, Sandusky was criminally charged.  (Doc. No. 1 ¶ 37.)   That same day, charges were brought against senior Penn State officials alleged to have covered up the Sandusky accusations in an effort to protect the university's football program; these officials included Penn State Athletic Director Timony M. Curley and Penn State Senior Vice-President of Finance and Business Gary C. Schultz.  (Id.)  Shortly thereafter, Defendant NCAA issued a letter to Penn State President Rodney Erickson demanding that the university produce information related to the grand jury indictment to assist the NCAA in its review of Penn State's response to the sexual abuse scandal.  (Id. ¶ 46.)  Following the initiation of these criminal charges, the law firm of Freeh, Sporkin & Sullivan LLP was charged with investigating and reporting the failure of Penn State personnel to respond to and report to authorities the sexual abuse of children (Freeh Report).  (Id. ¶ 41.)

On June 22, 2012, after a three-week trial, a jury in the Court of Common Pleas of Centre County found Sandusky guilty of 45 counts of the criminal charges against him.[2]  (Id. ¶ 39.) Approximately one month later, Freeh, Sporkin & Sullivan LLP issued its findings.  The Freeh

---

[2] On November 1, 2012, the Attorney General of Pennsylvania announced that former Penn State officials Curley and Schultz, and former Penn State President Graham Spanier, had been indicted by a grand jury on charges of perjury, conspiracy, obstruction of justice, and child endangerment in connection with their alleged role in covering up Sandusky's crimes.  These cases have not yet been brought to trial.  (Doc. No. 1 ¶ 39.)

Report confirmed that senior Penn State officials had collaborated to conceal accusations that Sandusky sexually abused children, and that Penn State leadership had exhibited a "total and consistent disregard . . . for the safety of Sandusky's victims" and worked together to conceal Sandusky's crimes for fear of bad publicity and out of sympathy for Sandusky.  (Id. ¶ 42.)  The Freeh Report described Penn State's culture as including an "excessive focus on athletics" and cited the failure of former President Spanier, former head football coach Joe Paterno, and former Athletic Director Tim Curley to protect children as not only "reveal[ing] numerous individual failings," but also "reveal[ing] weaknesses of the University's culture, governance, administration, compliance policies and procedures for protecting children."  (Doc. No. 11-2 at 128.)  The university accepted full responsibility for the failure of its administration to protect the victims abused by Sandusky, and began the process of implementing many of the recommendations contained in the Freeh Report.  (Id. ¶ 43.)

**B.**     **The consent decree**

Following the publication of the Freeh Report, Defendant NCAA initiated sanctions against Penn State.  At the direction of NCAA President Dr. Mark Emmert, the NCAA's established disciplinary procedures were bypassed and the matter was directed to the NCAA's Executive Committee and the Division I Board of Directors.  (Id. ¶ 48.)   Dr. Emmert, along with the NCAA Executive Committee and Division I Board of Directors, informed Penn State that if it did not accept Defendant's proposed consent decree and sanctions, Defendant would impose the football "death  penalty" on the school for a period of four years.[3]  (Id. ¶ 50.)  The proposed

---

[3] Imposition of the football "death penalty" would have cancelled Penn State's football program for four years.

consent decree, which accepted as true the findings contained in the Freeh Report, justified the imposition of the proposed sanctions on the basis of Penn State's failure to value and uphold Defendant's principles of institutional integrity, responsible conduct, and individual integrity. (Id. ¶ 52.)

By its terms, the consent decree: (1) required that Penn State pay a $60 million dollar fine into an endowment for sexual abuse education and sexual abuse victims over a period of five years; (2) banned Penn State from football post-season play for a period of four years; (3) reduced the number of football scholarships that Penn State was authorized to offer from 85 to 65 total scholarships per year for a period of four years, and 25 to 15 initial scholarships per year for a period of four years; (4) placed Penn State on probation for four years, necessitating the appointment of an on-campus integrity monitor; (5) vacated Penn State's football wins between 1998 and 2011; (6) waived the NCAA's bylaw restricting transfer of student athletes from Penn State to other colleges; and (7) required that Penn State permit football players to retain their athletic scholarships regardless of whether they continued to play football.  (Id. ¶ 48.)

On July 23, 2012, Penn State President Rodney Erickson accepted the terms of the consent decree, and waived any claim to further process or appeal under NCAA rules and any judicial process related to the subject matter of the consent decree.  (Id. ¶ 51.)  Though widely debated elsewhere, the wisdom of President Erickson's decision is not a question for this Court, nor is the relative fairness of the sanctions selected by the NCAA to address the university's admitted failings in the Sandusky matter.  The complaint limits this Court's review to the question of whether Plaintiff has articulated a violation of federal antitrust law.

### C.      The Governor's complaint

Before this Court for resolution is a discrete claim by Governor Tom Corbett on behalf of the Commonwealth of Pennsylvania that NCAA President Dr. Emmert, and the NCAA Executive Committee and Division I Board of Directors, participated in an unlawful antitrust conspiracy designed to destroy Penn State as an athletic competitor and cause a cascading economic fallout throughout Pennsylvania.  The Governor's complaint is an impassioned indictment of the sanctions against Penn State.  Citing the complete lack of authority by the NCAA President and its Executive Committee and Division I Board of Directors to involve themselves in disciplinary matters, and the unprecedented imposition of sanctions to address actions that did not directly affect student athletes or member competitiveness, the Governor condemns the NCAA's sanctions as "arbitrary and capricious," and personally motivated by a new NCAA President who was out to make a name for himself at Penn State's expense.

As the complaint observes, these allegations were the subject of lively debate in the court of public opinion.  They are not the subject of the Governor's claim for relief, and are not before the Court for a review on their merits.  The Court emphasizes that the Commonwealth's legal claim in this lawsuit is based only on its allegation that the NCAA is guilty of an antitrust violation.  To establish its Section 1 antitrust claim under the Sherman Act, Plaintiff cannot allege just <u>any</u> harm, but must point to harm directed at commercial activity of the type the Sherman Act is designed to address.  Further, Plaintiff must establish that Defendant's action affected the kind of antitrust activity over which this Court has jurisdiction.

### D.      The NCAA's response

The NCAA did not respond to the Governor's complaint with an answer, but instead moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the

Commonwealth can prove no set of facts that would entitle it to relief.  In an all-out blitz,

Defendant attacks every aspect of the complaint as bereft of the essential elements of an antitrust

claim.  First, Defendant objects on the grounds that the singular focus of the Sherman Act is to

protect consumers from reduced competition caused by those who would artificially manipulate

commercial markets.  Justifying its imposition of sanctions as within its discretion to protect

amateur athletics, Defendant argues that its actions do not merit review under the antitrust laws

because it did not seek to regulate commercial activity and Plaintiff does not so allege.

Even assuming that Plaintiff's allegations make out commercial activity, Defendant

points out that Plaintiff must still identify the commercial market affected by the alleged

wrongdoing and then articulate how the complained-of behavior stifled competition in those

markets.  Defendant argues that the complaint fails because it does not allege how Plaintiff's

identified nationwide markets for post-secondary education, Division I football players, and

college football-related memorabilia will be less competitive because of the NCAA's actions

against Penn State.  Rather, the complaint is driven by the allegation that Penn State as an

institution, and all those who rely on its success, will fail to thrive athletically or economically

because of the draconian nature of the NCAA sanctions.

Defendant goes on to argue that even were Plaintiff able to articulate a Sherman Act

claim (by pleading that the NCAA's actions touch commercial activity and have suppressed

competition and injured consumers in the markets for post-secondary education, Division I

football players, and college football-related memorabilia), the injuries alleged in the complaint

are either remote and not recognizable under antitrust law, or solely impact Penn State, which is

not a party to this action.  In other words, Defendant asserts that Plaintiff alleges derivative

injury, rather than injury suffered from a "competition-reducing" aspect of the allegedly illegal restraint that would qualify it as antitrust injury.

Each of Defendant's arguments is strong enough to render the Governor's action under antitrust law a Hail Mary pass. As the Court explains in some detail below, these arguments are well-founded in the law and require that the Governor's complaint be dismissed.

## II.    LEGAL STANDARD

At this stage of the proceedings, the Court must accept as true Plaintiff's factual allegations and determine whether Plaintiff has stated facts sufficient to state a claim under the applicable statute. When reviewing the complaint, the Court must construe the plaintiff's allegations in the "light most favorable to the plaintiff." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," a complaint may nevertheless be dismissed for its "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The Court's inquiry is guided by recent developments in pleading standards, which commenced with the United States Supreme Court's announcement of the "plausibility" standard in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009). Pleading requirements have thus shifted from simple notice pleading under Conley's "no set of facts" standard to a "more heightened form of pleading" requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). Now, to prevent dismissal, all civil complaints must set out

"sufficient factual matter" to show that the claim is facially plausible.  Id.

A complaint satisfies the plausibility standard when the factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 677.  This means that the plaintiff must show "more than a sheer possibility that a defendant acted unlawfully."  Id.  A complaint which pleads facts that are "merely consistent" with a defendant's liability "stops short of the line between possibility and plausibility" that would otherwise satisfy Rule 8's requirement that the plaintiff allege grounds "entitl[ing] him to relief."  Id.  Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the Court must do the following: (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement for relief."  See Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

III.    DISCUSSION

The threshold question for this Court is whether the alleged NCAA conspiracy to render Penn State's football program less competitive by harshly sanctioning the school constitutes commercial activity under established law, or whether it evades antitrust scrutiny because it is a legitimate enforcement action relating to amateurism and fair play. The Court now turns to the relevant law.

A.    Application of the Sherman Act

Section 1 of the Sherman Act only applies to conspiracies which restrain "trade or

commerce." 15 U.S.C. § 1; see Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 n.7

(1959).  The leading case for the Court is Smith v. NCAA, in which the United States Court of

Appeals for the Third Circuit held that Defendant's enforcement of its bylaw restricting

postgraduate athletic participation did not implicate Section 1 of the Sherman Act.  139 F.3d 180,

185-86 (3d Cir. 1998) (rev'd on other grounds).  There, a former undergraduate volleyball player

applied for a waiver of the NCAA's bylaw prohibiting her from competing at a graduate

institution other than the one she competed at as an undergraduate.[4]  Id. at 183.  The NCAA

refused to waive the bylaw, and the player subsequently brought suit, challenging the bylaw as an

unreasonable restraint of trade under Section 1 of the Sherman Act.  Id. at 184.

As a threshold question, the Third Circuit considered whether the challenged action was

sufficiently commercial to merit application of the Sherman Act: "[t]he question which we now

face . . . is whether antitrust laws apply only to the alleged infringer's commercial activities."  Id.

at 185.  Reasoning that the bylaw at issue was not related to the NCAA's commercial or business

activities, and, recognizing that "the Supreme Court has suggested that antitrust laws are limited

in their application to commercial and business endeavors,"[5] the Third Circuit concluded that

"the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements."  Id. at

186.  Although Smith is limited to eligibility rules, the Third Circuit's reasoning suggests that it

---

[4] "The Postbaccalaureate Bylaw provides that a student-athlete may not participate in intercollegiate athletics at a postgraduate institution other than in the institution from which the student earned her undergraduate degree."  Smith, 139 F.3d at 183.

[5] In NCAA v. Board of Regents of the University of Oklahoma, 468 U.S. 85, 94 (1986), the Supreme Court distinguished between "most of the regulatory controls of the NCAA . . . [as] justifiable means of fostering competition among amateur athletic teams," in contrast to the "specific restraints on football telecasts" at issue that violated Section 1.  Id. at 117.

would decline to apply the Sherman Act to any NCAA regulation that "primarily seek[s] to ensure fair competition in intercollegiate athletics." Id. at 185.[6]

Extending Smith's reach beyond eligibility rules, the Eastern District of Pennsylvania held that NCAA bylaws addressing recruiting and accreditation at institutional basketball camps for high school students were non-commercial in nature in Pocono Invitational Sports Camp, Inc. v. NCAA. 317 F. Supp. 2d 569, 584 (E.D. Pa. 2004). Drawing on the evidence presented with the NCAA's motion for summary judgment, the court found that the NCAA had enacted the certification and recruiting requirements at issue in response to college basketball recruiting "becoming a showplace that seemed inconsistent and inappropriate for college athletic recruiters." Id. at 583. Accordingly, the court concluded that "when the NCAA promulgated these rules it was acting in a paternalistic capacity to promote amateurism and education. Thus, for the same reasons the Third Circuit found eligibility rules immune from antitrust scrutiny, [the Court] find[s] that these recruiting rules are also immune." Id.

In one of the few reported cases involving the application of the "death penalty," players from the University of Arizona sought to enjoin the NCAA's sanctions on both due process grounds and as an antitrust violation. Justice v. NCAA, 577 F. Supp. 356, 360 (D. Ariz. 1983). The Court denied injunctive relief on both claims. Without addressing the "commercial or non-

---

[6] Many other courts have relied on Smith's distinction between the NCAA's commercial and non-commercial rulemaking. See Bassett v. NCAA, 528 F.3d 426, 433 (6th Cir. 2008) ("The Complaint is wholly devoid of any allegation on the commercial nature of NCAA's enforcement of the rules it determined Bassett violated . . . . We find Bassett's Complaint lacks the critical commercial activity component required to permit application of the Sherman Act"); Worldwide Basketball & Sport Tours v. NCAA, 388 F.3d 955, 959 (6th Cir. 2004) ("The dispositive inquiry in this regard is whether the rule itself is commercial, not whether the entity promulgating the rule is commercial."); Bowers v. NCAA, 9 F.Supp.2d 460, 497 (D.N.J. 1998) (academic eligibility rules non-commercial in nature).

commercial" nature of the sanction, the court soundly rejected Plaintiff's arguments that the sanctions constituted a Sherman Act violation because it was driven by the NCAA's desire to make the University of Arizona less competitive.  Id. at 379.  Although the court did not analyze whether the regulation was "commercial," the court upheld the sanctions because the regulatory action at issue "pertain[ed] solely to the NCAA's stated goal of preserving amateurism."  Id. at 380.  In other words, there had been "no showing by the plaintiffs that the NCAA, its member institutions, or the Infractions Committee had any purpose to insulate themselves from competition by imposing sanctions on the University of Arizona" for its violations of eligibility and recruiting bylaws.  Id. at 379.  Moreover, the Court noted that "[t]he fact that the sanctions might have an incidental anticompetitive effect on coaches or athletes does not in itself render them unreasonable restraints."  Id. at 382.

The Court now turns to the parties' arguments on whether Defendant's complained-of conduct falls under the Sherman Act.  Defendant urges the Court to find that the consent decree falls squarely within Smith's definition of non-commercial activity, and is a lawful exercise of its authority to enforce the standards of amateur play.  Defendant emphasizes that the consent decree includes Penn State's admission that it violated Defendant's "basic standards of honesty, ethical conduct, and institutional control that the NCAA and its members deem necessary to preserve the character and integrity of college sports," and argues that these principles are just as focused on the promotion of amateurism and fair play as its rules on recruiting and eligibility, which courts have repeatedly found to be non-commercial in nature.[7]  The Court does not agree.  Unlike the

---

[7] See, e.g., Smith v. NCAA, 139 F.3d 180 (3d Cir. 1999); Justice v. NCAA, 577 F.Supp. 356 (D. Ariz. 1983).  In each such instance, the courts have consistently held that Defendant's ability to enforce its bylaws relating to preserving amateurism and the tradition of intercollegiate

cases cited by Defendant and discussed by the Court, the factual allegations of conspiracy and state-wide economic fallout at play in this case place the complaint outside previous examples of NCAA enforcement actions related to amateurism and fair play held to be non-commercial.

The Court next turns to Plaintiff, who ambitiously maintains that "[t]he Penn State sanctions fall well on the commercial side of the line." (Doc. No. 24 at 14.)  In making its argument, Plaintiff urges alternate theories on the Court: first, that the sanctions agreement contains scholarship limits, which have been held to be commercial activity and subject to review under the Sherman Act, and, second, that the sanctions will reduce the Penn State football program's ability to generate revenue for the university.  (Id.)  Plaintiff also argues that the Court must disregard Defendant's purported rationale for imposing the sanctions agreement because Defendant's departure from established enforcement procedures demonstrates that its imposition of the sanctions hides an ulterior motive.  (Id. at 15-16.)

At the outset, the Court will dispense with Plaintiff's two initial arguments.  First, the Court finds Plaintiff's argument that scholarship limits constitute commercial activity under the United States Court of Appeals for the Seventh Circuit's opinion in Agnew v. NCAA to be unpersuasive.  Contrary to the Third Circuit's opinion in Smith, which distinguished between non-commercial and commercial activity for the purposes of applying the Sherman Act to Defendant's regulatory activity, the Seventh Circuit held in Agnew that the Sherman Act "applies generally" to Defendant's actions.  Agnew v. NCAA, 683 F.3d 328, 340 (7th Cir. 2012).  That is

---

athletics does not touch on commercial activity and therefore should not be circumscribed by the antitrust laws.  See, e.g., Bassett, 528 F.3d at 433 ("Similar to the eligibility rules in Smith, NCAA's rules on recruiting student athletes, specifically those rules prohibiting improper inducements and academic fraud, are all explicitly non-commercial").

not the law in this Circuit, and thus the Court declines to find that the scholarship limits portion of the sanctions agreement is sufficient to render the entire agreement "commercial" on the basis of Agnew.

Second, the Court is not persuaded by Plaintiff's alternative argument: that the sanctions agreement is commercial because it will cause Penn State's revenue to decline.  There are two fundamental flaws to Plaintiff's approach.  First, the Third Circuit rejected this approach in Smith, making it clear that any derivative effect of Defendant's regulatory activity is irrelevant to the "commercial nature" inquiry.  See Smith, 139 F.3d at 185 ("[R]ather than focus on Smith's alleged injuries, we consider the character of the NCAA's activities.").  Moreover, as the Court details below, the Governor represents the natural citizens of the Commonwealth as parens patriae, not Penn State.  Even were Plaintiff able to articulate financial injury to Penn State cognizable under the Sherman Act, the Governor cannot lawfully advance this claim on Penn State's behalf.

Having disposed of Plaintiff's first two points, the Court turns to Plaintiff's more creative argument: that the Court must disregard Defendant's purported non-commercial rationale for imposing sanctions on Penn State because Defendant failed to give the school sufficient due process and had not previously sanctioned any other university for violating its institutional principles outlining honesty and ethical conduct.  (Doc. No. 24 at 15-16.)   In other words, Plaintiff asserts that Defendant's actions are such an aberration that the Court must necessarily find that its proposed rationale is a pretext.  (Doc. No. 1 ¶¶ 56, 57, 58.)

Plaintiff's argument faces two hurdles.  First, although Plaintiff makes sweeping allegations that Defendant imposed the sanctions on Penn State for the "purpose of enhancing

their own public image at the expense of a competitor," and the NCAA Executive Committee and Division I Board of Directors wanted to "severely cripple a major competitor and irreparably harm the citizens of the Commonwealth," these conclusory allegations, without more, do not permit the Court to draw the <u>reasonable</u> inference that Defendant's justification for imposing the sanctions is a pretext.  Indeed, Plaintiff offers no facts to support this allegation.  <u>See</u> <u>Twombly</u>, 550 U.S. at 556.  Rather, Plaintiff relies on its contention that Defendant's behavior is so inconsistent with its actions in the past that its rationale for imposing sanctions on Penn State must be a pretext. (<u>Id.</u> ¶ 56.)  This is not enough under <u>Twombly</u>.

Not only do Plaintiff's allegations of ulterior motive lack the factual enhancement that would allow the Court to accept them as plausible under the <u>Twombly</u> analysis discussed above, the Court is still faced with a more pressing problem: the complaint is fundamentally lacking in allegations that Defendant's alleged ulterior motive hid a commercial purpose.[8]  Although Plaintiff alleges that the NCAA sought to improve its own reputation for being soft on discipline by harshly sanctioning Penn State (<u>Id.</u> ¶¶ 34, 56), and that unidentified members of the Executive Committee and Division I Board of Directors wished to cripple Penn State as an athletic competitor and harm the citizens of the Commonwealth (<u>Id.</u> ¶ 48), the Court finds that these allegations, without any indication that Defendant sought a commercial advantage for itself or sought to regulate commercial activity, are not enough to render Defendant's complained-of conduct commercial.  <u>See</u> <u>Smith</u>, 139 F.3d at 185.

---

[8] <u>See</u> <u>Bassett v. NCAA</u>, No. 04-425, 2005 WL 3767016, at *3 (E.D. Ky. May 3, 2005) ("Rather than intending to provide the NCAA or any of its member schools with a commercial advantage, enforcement of rules governing recruiting, improper inducements, and academic fraud primarily seek to ensure fair competition") (citation and internal quotation marks omitted).

On review, the Court finds that Plaintiff's argument that the Court can intuit commercial motive from Defendant's actions is deficient under Twombly.  Moreover, the complaint is devoid of allegations that Defendant sought to regulate commercial activity or obtain any commercial advantage for itself by imposing sanctions on Penn State.  See Smith, 139 F.3d at 185; see also Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 n.7 (1959) ("[T]he Act is aimed primarily at combinations having commercial objectives").  Given the benchmark set by Smith and its progeny, the Court finds that Plaintiff's allegations do not make out commercial activity subject to the Sherman Act.

### B.      Section 1 of the Sherman Act

Were the Court to find otherwise – that the Sherman Act does apply to Defendant's behavior – Plaintiff must still plow through Defendant's numerous objections to its antitrust claim in order for the complaint to survive.  An antitrust plaintiff must plead the following to make out a Section 1 claim: (1) that the defendant was party to a "contract, combination . . . or conspiracy," and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade."  Burtch v. Milberg Factors, Inc., 662 F.3d 212 (3d Cir. 2011) (citation and quotation marks omitted).  The Court will look at each element in turn.

### 1.      Concerted action

The first element – a contract, combination, or conspiracy – requires that a plaintiff allege "some form of concerted action."  Ins. Brokerage, 618 F.3d at 321.  Thus, the plaintiff must allege that the defendants acted with "unity of purpose or a common design and understanding," and "a conscious commitment to a common scheme."  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004) (citation and quotation marks omitted).  Without the existence of an

agreement reflecting "a meeting of the minds in an unlawful arrangement," liability under

Section 1 is not triggered.  In re Baby Food Antitrust Litig., 166 F.3d 112, 117 (3d Cir. 1999)

(citation and internal quotation marks omitted).

The Court turns to whether Plaintiff's allegations of "concerted action" reflect the

"conscious commitment to a common scheme" necessary to make out a Section 1 violation.

Plaintiff alleges that "[t]he actions by the NCAA, its member institutions, and specifically the

institutions represented on the NCAA's executive committee and board of directors, in

threatening Penn State with the football "death penalty" and forcing Penn State into accepting the

consent decree, constitute concerted action within the meaning of Section 1 of the Sherman Act."

(Doc. No. 1 ¶ 63.)  In support, Plaintiff alleges that "Dr. Emmert took the matter directly to the

Executive Committee and Division I Board of Directors" who "chose to seize the opportunity to

impose swift and severe sanctions."  (Id. ¶ 48).  Plaintiff supplies two separate motivations

behind this alleged conspiracy: that Defendant was motivated to impose sanctions on Penn State

because Defendant wanted to "assert its relevance as a protector of student athletes," and, that

unidentified members of Defendant's Executive Committee and the Division I Board of

Directors, which were made up of representatives of competitor colleges, wanted to "severely

cripple a major competitor and irreparably harm the citizens of the Commonwealth."  (Id. ¶¶ 45,

48.)

These allegations fall short of a Section 1 claim, which requires the "existence of an

agreement."  Burtch, 662 F.3d at 221.  Putting aside Plaintiff's conclusory allegation that the

NCAA's actions "constitute concerted action," the Court cannot find any factual allegations

supporting Plaintiff's argument that Defendant engaged in concerted action that would "raise

[its] right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.  Here, Plaintiff

alleges that Dr. Emmert "took the matter" to unidentified members on the Executive Committee

and Division I board of directors, who then "seized the opportunity" to impose sanctions on Penn

State.  (Doc. No. 1 ¶ 48.)  The Court does not find that this allegation, without any supporting

factual allegations, rises to the level of "concerted action."  Nowhere does Plaintiff allege that Dr.

Emmert, and unidentified members of the Division I Board of Directors and Executive

Committee, agreed together to punish Penn State in an effort to achieve an unlawful purpose

forbidden by the <u>antitrust laws</u>.  Returning to <u>Twombly</u>'s requirement that a plaintiff must plead

"factual conduct that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged," the Court cannot find any factual allegations supporting Plaintiff's

allegation of "concerted action" that might nudge its conspiracy claim into "plausible" territory.

<u>See also</u> <u>Gordon v. Lewistown Hosp.</u>, 423 F.3d 184, 208 (3d Cir. 2005) ("[T]he alleged

conspirators [must have] had a conscious commitment to a common scheme designed to achieve

an unlawful objective.").  Thus, the Court finds that Plaintiff fails to sufficiently plead concerted

action.

### 2.      Unreasonable restraint of trade

Even assuming that Plaintiff sufficiently alleged that Defendant engaged in "concerted

action," Plaintiff must still defend the challenge to the second element of its claim: that the terms

of the consent decree and the manner in which it was imposed constitute an unreasonable

restraint on trade.  The reasonableness of any restraint on trade is evaluated under one of three

standards, depending on the nature of the alleged restraint: (1) rule of reason, (2) quick look, and

(3) <u>per se</u> illegality.

Plaintiff urges the Court to apply per se review, the least rigorous of these standards, which eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.  Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877, 886 (2007).  Agreements that fall under established per se categories of illegality, such as group boycotts and horizontal agreements to fix prices, are "conclusively presumed to unreasonably restrain competition."  Ins. Brokerage, 618 F.3d at 316 (citation and quotation marks omitted).  Under the per se standard, the plaintiff need not define a market or allege market power in her complaint, as she would under the rule of reason.  Pace Elec., Inc. v. Canon Computer Sys., 213 F.3d 118, 123 (3d Cir. 2000).

Plaintiff argues that its complaint justifies application of the per se standard because its allegations make out a group boycott: "joint efforts by NCAA members to disadvantage a competitor (Penn State) by directly denying it relationships (full participation in the NCAA) it needs to compete."  (Doc. No. 24 at 15.)  The Court is not persuaded.  A group boycott is made out when a plaintiff sufficiently alleges "concerted action with a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both."  See Malley-Duff Assoc., Inc. v. Crown Life Ins. Co., 734 F.2d 133, 140 (3d Cir. 1984) (citation and quotation marks omitted).  Here, as analyzed previously, Plaintiff's allegations fall short of "concerted action."  Thus, the Court need not credit Plaintiff's allegations that Defendant and its member institutions' "joint efforts" to disadvantage PSU constitutes a group boycott and thus merits per se review.[9]

_____

[9] The Court also observes that Penn State is not excluded from any of the relevant markets identified in its complaint.  Furthermore, Penn State is still able to compete in NCAA-sponsored football games.

The Court looks next to quick look review, which may be applied in the exceptional case when an observer with "even a rudimentary understanding of economics" could conclude that the restraint at issue would have an anticompetitive effect on customers and markets.  California Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).  Examples of restraints justifying quick look review include: an absolute ban on competitive bidding, Nat'l Soc. of Prof'l Engineers, 435 U.S. at 692; a horizontal agreement among dentists to withhold a certain service from their customers, FTC v. Ind. Fed.'n of Dentists, 476 U.S. 447, 459 (1986); and express output limitations on live telecasts of football games, NCAA v. Bd. of Regents of the Univ. of Ok., 468 U.S. 85, 99-100 (1984).  If quick look analysis applies, the Court presumes competitive harm, and the burden is thus placed on the defendant to set forth some competitive justification for the restraint at issue. Gordon, 423 F.3d at 210.

Plaintiff's complaint does not outline the exceptional case warranting quick look review, because it does not allege a restraint of the type whose anticompetitive effects are so obvious that even an onlooker with a "rudimentary understanding of economics" could conclude that the sanctions suffered by Penn State would have an "anticompetitive effect on customers and markets."  Although Plaintiff alleges that consumers will face anticompetitive effects in the nationwide markets for post-secondary eduction, Division I football players, and college-football related memorabilia as the probable result of Penn State becoming less competitive as a football program, these speculative allegations do not make out the "obvious" anticompetitive effects that would require quick look analysis.

Having concluded that Plaintiff's complaint demands more than per se or quick look

review, the Court arrives at the rule of reason.[10]  Under rule of reason analysis, the plaintiff bears

the initial burden of demonstrating that the alleged restraint produced an adverse anticompetitive

effect within the relevant geographic market.  Gordon, 423 F.3d at 210.  This can be achieved by

alleging that the restraint at issue is facially anticompetitive, or, that its enforcement reduced

output, raised prices, or reduced quantity.  Id.  If the plaintiff carries this burden, the Court next

evaluates whether the alleged anticompetitive effects are justified by any countervailing

procompetitive benefits.  Eichorn v. AT&T Corp., 248 F.3d 131, 143 (3d Cir. 2001).

The Court turns to whether Plaintiff adequately alleges anticompetitive effects in the

markets identified in its complaint.  Plaintiff outlines three relevant markets allegedly harmed by

Defendant's actions: (1) the nationwide market for post-secondary education, which comprises

colleges and universities across the United States that offer education at the post-secondary level;

(2) the nationwide market for Division I football players, which comprises all NCAA Division I

football programs that compete for top football talent emerging from the nation's high schools;

and (3) the nationwide market for the sale of college football-related apparel and memorabilia,

which comprises the numerous major college athletic programs that compete against each other

to build national brands beyond their campus communities  (Doc. No. 1 ¶¶ 70-72.)

Plaintiff argues that it has carried its burden by alleging anticompetitive effects in each of

these markets.  First, Plaintiff argues that it alleged a "direct effect on output in the market for

---

[10] Defendant's actions are typically subject to review under the rule of reason.  See Bd. of
Regents, 468 U.S. at 100-01.  Underlying this principle is the Supreme Court's recognition that
"a certain degree of cooperation is necessary if the type of competition that [the NCAA] seek[s]
to market be preserved . . . . [i]t is reasonable to assume that most of the regulatory controls of
the NCAA are justifiable means of fostering competition among amateur athletic teams and
therefore procompetitive."  Bd. of Regents, 368 U.S. at 117.

Division I football players: the temporary reduction in scholarships that Penn State may offer recruits.  (Doc. No. 24 at 23).  Second, Plaintiff argues that it alleged "reduced quality" in the market for post-secondary education, because the complaint alleges that by virtue of denying Penn State football-related revenue, and imposing a $60 million fine, the sanctions are likely to force Penn State to "reduce the availability and/or quality of some of its programs."  (Id. at 24.)

The Court observes that Plaintiff only addressed two of its relevant markets in its brief in opposition: the market for post-secondary education and the market for Division I football players.  On review, the Court finds that Plaintiff's allegations fail with respect to both markets under the rule of reason.  First, even assuming that Penn State will face difficulty in competing for Division I football players as a result of the sanctions, the antitrust laws are not implicated. The fact that Penn State will offer fewer scholarships over a period of four years does not plausibly support its allegation that the reduction of scholarships at Penn State will result in a market-wide anticompetitive effect, such that the "nation's top scholastic football players" would be unable to obtain a scholarship in the nationwide market for Division I football players.

Neither does Plaintiff plausibly allege an anticompetitive effect in the national market for post-secondary education.  Plaintiff's argument that Penn State's payment of the $60 million dollar fine, in combination with its diminished football revenue, will likely result in such a significant reduction in the quality of Penn State's programs that competition will be eased in the nationwide market for post-secondary education, is simply not plausible.  Furthermore, Plaintiff's allegation that the sanctions will result in Penn State raising tuition and reducing its investment in programs and facilities, thereby removing incentive for its competitor schools in the nationwide market to keep tuition low and improve their own facilities, fails for the same reason.

21

Because Plaintiff has not sufficiently alleged anticompetitive effects in the relevant markets identified in its complaint, the Court finds that Plaintiff has failed to carry its burden under the rule of reason.  Thus, the Court need not proceed to Defendant's procompetitive justifications.

### C.   Plaintiff's standing to seek injunctive relief

The Court will now address the parties' final dispute: whether Plaintiff is the proper party to bring this lawsuit under the rules that apply to antitrust actions. The pleadings present three separate points relating to Plaintiff's standing for the Court's review: Plaintiff's authority to bring this action parens patriae, the sufficiency of Plaintiff's alleged antitrust injury, and, whether Plaintiff has "antitrust standing."

The Court begins with whether Plaintiff may bring this action in its parens patriae capacity.  The doctrine of parens patriae standing allows states to bring suit on behalf of their citizens in certain circumstances by asserting an injury to a "quasi-sovereign interest."  Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601 (1982).  For a state to bring suit in its parens patriae capacity in federal court, it must establish that its parens patriae interest satisfies both Article III standing, and, is a proper basis for suit under the applicable statute.[11] Article III injury in a suit brought by a state in its parens patriae capacity rests on whether the complaint alleges harm to the welfare of that state's citizens, rather than harm to the proprietary interest of the state.  Injury to the state's economy or the health and welfare of its citizens, if sufficiently severe and generalized, can give rise to a quasi-sovereign interest in relief justifying an action brought in parens patriae.  See, e.g., Com. of Pa., by Shapp v. Kleppe, 533 F.2d 668, 674 (D.C. Cir. 1976).  In this case, Plaintiff alleges that Defendant's behavior has harmed and

---

[11] See Com. of Pa. v. Porter, 659 F.2d 306, 316 (3d Cir. 1981).

will continue to harm the natural citizens of Pennsylvania, as well as the Commonwealth's economy.  Thus, the Court is satisfied that Plaintiff satisifies Article III's threshold standing requirement.

The Court now turns to the second prong of Plaintiff's parens patriae standing: whether the suit is authorized under the applicable statute.  It is beyond dispute that federal antitrust law, specifically Section 16 of the Clayton Act,[12] provides statutory authorization for claims brought parens patriae.  Georgia v. Penn. R.R. Co., 324 U.S. 439, 447 (1945); see also Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 259 (1972).  Thus, the Court finds that Plaintiff may seek injunctive relief under Section 16 in its parens patriae capacity.  However, Plaintiff "must still show that residents on whose behalf it sues have a cause of action" under the antitrust laws, and Plaintiff must adequately allege both an antitrust injury and demonstrate that it has antitrust standing.[13]  The Court will review each requirement.

First, stating a claim under Section 1 of the Sherman Act requires that a plaintiff sufficiently plead an antitrust injury.  See Toldeo Mack Sales & Serv. v. Mack Trucks, Inc., 530 F.3d 204, 225 (3d Cir. 2008).  This requirement applies whether a plaintiff is seeking treble damages or injunctive relief; in order to "seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."  Cargill, Inc. v. Monfort of Co., Inc., 479 U.S. 104,113 (1986) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S.

---

[12] Although Plaintiff alleges a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, its right to injunctive relief arises under Section 16 of the Clayton Act, 15 U.S.C. § 26.

[13] See Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, § 355 (2012).

477, 489 (1977)).  In other words, the alleged injury must be caused by the competition-reducing

aspect of the defendant's illegal conduct in order to be considered an "antitrust injury."  W. Penn

Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 101 (3d Cir. 2010).  Alleged harms that

are causally related to Defendant's complained-of conduct, but are not alleged to have occurred

as a result of lessened competition – do not qualify as antitrust injury.  Id.

   Moreover, because antitrust laws aim to protect competition, not competitors, the Court

must analyze the antitrust injury from the point of view of the consumer.  Mathews v. Lancaster

General Hosp., 87 F.3d 624, 641 (3d Cir. 1996).  Thus, the Court must assess whether the

antitrust plaintiff sufficiently alleged that the challenged conduct affected "prices, quantity, or

quality of goods and services" in the relevant market, not just his own welfare.  Id. (citation

omitted).  It also bears mentioning that "[a]s a general matter, the class of plaintiffs capable of

satisfying the antitrust-injury requirement is limited to consumers and competitors in the

restrained market," and to "those whose injuries are the means by which the defendants seek to

achieve their anticompetitive ends."  W. Penn, 627 F.3d at 102 (internal citations omitted).

   Interrelated with the concept of antitrust injury is the notion of "antitrust standing," which

represents the court's evaluation of the relationship between the antitrust plaintiff's alleged injury

and the defendant's alleged wrongdoing.  Associated Gen. Contractors of Cal., Inc. v. Cal. State

Council of Carpenters, 459 U.S. 519, 535 (1983) ("[T]he question requires us to evaluate the

plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.").

In other words, antitrust standing captures the requirement that a plaintiff must demonstrate a

direct link between the alleged antitrust violation and the antitrust injury, and is thus the proper

plaintiff to bring the antitrust action before the court.[14]

Because Plaintiff's complaint must make out an antitrust injury in order to have antitrust standing, the Court will begin with Plaintiff's alleged injury.  See Cargill, 479 U.S. at 110 n.5. Plaintiff's complaint alleges the following harm to the Commonwealth: (1) harm to the natural citizens of Pennsylvania who depend on the Penn State football program for their jobs and livelihoods; (2) harm to the state revenue base from diminished Penn State football ticket sales, lessened hospitality revenue on Penn State football weekends, diminished interested in Penn State football apparel and memorabilia sales, expected decline in jobs attributable to a diminished football program, diminished spending by Penn State on capital improvements and supplies, and diminished interest in Penn State-themed events, such as summer football camps; (3) additional harm to the Commonwealth from payment of the $60 million fine, which will necessarily be paid through some combination of tuition hikes and increased appropriations from the Commonwealth's treasury; and (4) harm to Penn State students from the diminished value of the Penn State educational and community experience.  (Doc. No. 1 ¶ 75.)  At this juncture, it bears repeating that Plaintiff outlined three relevant markets threatened by Defendant's behavior in its complaint: (1) the nationwide market for post-secondary education; (2) the nationwide market for Division I football players; and (3) the nationwide market for the sale of college football-related apparel and memorabilia.  (Id. ¶¶ 70-72.)

The Court now turns to whether the harms alleged in Plaintiff's complaint constitute

---

[14] See City of Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 268 (3d Cir. 1998). The Third Circuit has held that the antitrust standing inquiry is essentially the same in the context of injunctive relief, except that when seeking injunctive relief, the complainant need only demonstrate a significant threat of injury from an impending violation of the antitrust laws.  Id.

antitrust injury.  As explained, an antitrust injury must stem from a "competition-<u>reducing</u>" aspect of the defendant's behavior.  <u>See</u> <u>Atl. Richfield Co. v. USA Petroleum Co</u>, 495 U.S. 328, 334 (1990).  Injuries that are "causally related" to the complained-of behavior, but do not result from any alleged injury to competition in the relevant markets, do not qualify as antitrust injury.  <u>Id.</u>  Thus, Plaintiff would need to allege that the harms threatening the natural citizens of Pennsylvania result from reduced competition in the markets identified in Plaintiff's complaint, not that citizens will suffer if Penn State and its football program alone is weakened as the result of the sanctions.  <u>See</u> <u>W. Penn.</u>, 627 F.3d at 101.

On review of the complaint, the Court finds that Plaintiff has not cleared this hurdle. At core, Plaintiff's complaint alleges derivative injury to Pennsyvlania citizens as the result of Penn State's football program becoming less competitive, not to lessened competition in the relevant markets.  <u>See</u> <u>Bassett v. NCAA</u>, No. 04-425, 2005 WL 3767016, at *4 (E.D. Ky. May 3, 2005) ("At best, Basset alleged injury to himself as a competitor in the marketplace and not an injury to competition in a relevant market.").  Nowhere in Plaintiff's complaint does Plaintiff link any alleged harm to the natural citizens of Pennsylvania to <u>reduced competition</u> in the relevant markets for post-secondary education, Division I football players, and college football-related memorabilia identified in Plaintiff's complaint.  Without more, Plaintiff's allegations do not make out an antitrust injury.  <u>See</u> <u>Atl. Richfield Co.</u>, 495 U.S. at 334 (citations omitted) ("[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny").  The Court's conclusion that Plaintiff's complaint fails to make out an antitrust injury obviates the need to analyze whether Plaintiff has antitrust standing.  <u>See</u> <u>Cargill</u>, 479 U.S. at 110

n.5 ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing").

**IV.    CONCLUSION**

The Governor's complaint implicates the extraordinary power of a non-governmental entity to dictate the course of an iconic public institution, and raises serious questions about the indirect economic impact of NCAA sanctions on innocent parties.  These are important questions deserving of public debate, but they are not antitrust questions.  In another forum the complaint's appeal to equity and common sense may win the day, but in the antitrust world these arguments fail to advance the ball.  Plaintiff's complaint fails on all prongs: it fails to allege commercial activity subject to the Sherman Act; it fails to allege that Defendant's activity constituted a violation of Section 1 of the Sherman Act; and, it fails to allege that Plaintiff suffered an antitrust injury.  On thorough review, this Court can find no basis in antitrust law for concluding that the harms alleged entitle Plaintiff to relief.  Accordingly, the complaint must be dismissed.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, THOMAS W.** | : | |
| **CORBETT, JR., GOVERNOR** | : | |
| **Plaintiff** | : | **No. 1:13-cv-00006** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **NATIONAL COLLEGIATE** | : | |
| **ATHLETIC ASSOCIATION,** | : | |
| **Defendant** | : | |

**<u>ORDER</u>**

      **AND NOW**, on this 6th day of June 2013, **IT IS HEREBY ORDERED THAT**

Defendant's motion to dismiss Plaintiff's complaint (Doc. No. 9) is **GRANTED**.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
